Justice Stevens,
concurring in the judgment.
When we granted certiorari in this case, I assumed that our decision would bring the debate about lethal injection as a method of execution to a close. It now seems clear that it will not. The question whether a similar three-drug protocol may be used in other States remains open, and may well be answered differently in a future case on the basis of a more complete record. Instead of ending the controversy, I am now convinced that this case will generate debate not only about the constitutionality of the three-drug protocol, and specifically about the justification for the use of the paralytic agent, pancuronium bromide, but also about the justification for the death penalty itself.
I
Because it masks any outward sign of distress, pancuronium bromide creates a risk that the inmate will suffer excruciating pain before death occurs. There is a general understanding among veterinarians that the risk of pain is sufficiently serious that the use of the drug should be proscribed when an animal’s life is being terminated.[1] As a *72 result of this understanding among knowledgeable professionals, several States — including Kentucky — have enacted legislation prohibiting use of the drug in animal euthanasia. See 2 Ky. Admin. Regs., tit. 201, ch. 16:090, § 5(1) (2004).[2] It is unseemly — to say the least — that Kentucky may well kill *73 petitioners using a drug that it would not permit to be used on their pets.
Use of pancuronium bromide is particularly disturbing because — as the trial court specifically found in this case — it serves “no therapeutic purpose.” App. 763. The drug’s primary use is to prevent involuntary muscle movements, and its secondary use is to stop respiration. In my view, neither of these purposes is sufficient to justify the risk inherent in the use of the drug.
The plurality believes that preventing involuntary movement is a legitimate justification for using pancuronium bromide because “[t]he Commonwealth has an interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as signs of consciousness or distress.” Ante, at 57. This is a woefully inadequate justification. Whatever minimal interest there may be in ensuring that a condemned inmate dies a dignified death, and that witnesses to the execution are not made uncomfortable by an incorrect belief (which could easily be corrected) that the inmate is in pain, is vastly outweighed by the risk that the inmate is actually experiencing excruciating pain that no one can detect.[3] Nor is there any necessity for pancuronium bromide to be included in the cocktail to inhibit respiration when it is immediately followed by potassium chloride, which causes death quickly by stopping the inmate’s heart.
*74 Moreover, there is no nationwide endorsement of the use of pancuronium bromide that merits any special presumption of respect. While state legislatures have approved lethal injection as a humane method of execution, the majority have not enacted legislation specifically approving the use of pancuronium bromide, or any given combination of drugs.[4] And when the Colorado Legislature focused on the issue, it specified a one-drug protocol consisting solely of sodium thiopental. See Colo. Rev. Stat. Ann. § 18-1.3-1202 (2007).[5] In the majority of States that use the three-drug protocol, the drugs were selected by unelected department of correction *75 officials with no specialized medical knowledge and without the benefit of expert assistance or guidance. As such, their drug selections are not entitled to the kind of deference afforded legislative decisions.
Nor should the failure of other state legislatures, or of Congress, to outlaw the use of the drug on condemned prisoners be viewed as a nationwide endorsement of an unnecessarily dangerous practice. Even in those States where the legislature specifically approved the use of a paralytic agent, review of the decisions that led to the adoption of the three-drug protocol has persuaded me that they are the product of “ ‘administrative convenience’ ” and a “stereotyped reaction” to an issue, rather than a careful analysis of relevant considerations favoring or disfavoring a conclusion. See Mathews v. Lucas, 427 U. S. 495, 519, 520-521 (1976) (Stevens, J., dissenting). Indeed, the trial court found that “the various States simply fell in line” behind Oklahoma, adopting the protocol without any critical analysis of whether it was the best available alternative.[6] App. 756; see also post, at 117 (Ginsburg, J., dissenting).
New Jersey’s experience with the creation of a lethal injection protocol is illustrative. When New Jersey restored the death penalty in 1983, its legislature “fell in line” and enacted a statute that called for inmates to be executed by “continuous, intravenous administration until the person is dead of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent in a quantity sufficient to cause death.” N. J. Stat. Ann. §2C:49-2 (West 2005). New Jersey Department of Corrections (DOC) officials, including doctors and administrators, immediately expressed *76 concern. The capital sentencing unit’s chief doctor, for example, warned the assistant commissioner that he had “‘concerns ... in regard to the chemical substance classes from which the lethal substances may be selected.’” Edwards, New Jersey’s Long Waltz With Death, 170 N. J. L. J. 657, 673 (2002).[7] Based on these concerns, the former DOC commissioner lobbied the legislature to amend the lethal injection statute to provide DOC with discretion to select more humane drugs: “‘[We wanted] a generic statement, like “drugs to be determined and identified by the commissioner, or the attorney general, or the Department of Health” ’.. .. ‘Who knew what the future was going to bring?’” Ibid. And these concerns likely motivated the DOC’s decision to adopt a protocol that omitted pancuronium bromide — despite the legislature’s failure to act on the proposed amendment. See Denno, When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us, 63 Ohio St. L. J. 63, 117-118, 233 (2002) (explaining that the New Jersey protocol in effect in 2002 called for use of a two-drug cocktail consisting of sodium thiopental and potassium chloride).
Indeed, DOC officials seemed to harbor the same concerns when they undertook to revise New Jersey’s lethal injection protocol in 2005. At a public hearing on the proposed amendment, the DOC supervisor of legal and legislative affairs told attendees that the drugs to be used in the lethal injection protocol were undetermined:
“Those substances have not been determined at this point because when and if an execution is scheduled the *77 [DOC] will be doing research and determining the state-of-the-art drugs at that point in time .... We have not made a decision on which specific drugs because we will have several months once we know that somebody is going to be executed and it will give us the opportunity at that point to decide which would be the most humane.
“And things change. We understand that the state-of-the-art is changing daily so to say we are going to use something today when something may be more humane becomes known later wouldn’t make sense for us.” Tr. of Public Hearing on Proposed Amendments to the New Jersey Lethal Injection Protocol 36 (Feb. 4, 2005).
It is striking that when this state agency — with some specialized medical knowledge and with the benefit of some expert assistance and guidance — focused on the issue, it disagreed with the legislature’s “stereotyped reaction,” Mathews, 427 U. S., at 520,521 (Stevens, J., dissenting), and specified a two-drug protocol that omitted pancuronium bromide.[8]
In my view, therefore, States wishing to decrease the risk that future litigation will delay executions or invalidate their protocols would do well to reconsider their continued use of pancuronium bromide.[9]
*78 II
The thoughtful opinions written by The Chief Justice and by Justice Ginsburg have persuaded me that current decisions by state legislatures, by the Congress of the United States, and by this Court to retain the death penalty as a part of our law are the product of habit and inattention rather than an acceptable deliberative process that weighs the costs and risks of administering that penalty against its identifiable benefits, and rest in part on a faulty assumption about the retributive force of the death penalty.
In Gregg v. Georgia, 428 U. S. 158 (1976), we explained that unless a criminal sanction serves a legitimate penological function, it constitutes “gratuitous infliction of suffering” in violation of the Eighth Amendment. We then identified three societal purposes for death as a sanction: incapacitation, deterrence, and retribution. See id., at 183, and n. 28 (joint opinion of Stewart, Powell, and Stevens, JJ.). In the past three decades, however, each of these rationales has been called into question.
While incapacitation may have been a legitimate rationale in 1976, the recent rise in statutes providing for life imprisonment without the possibility of parole demonstrates that incapacitation is neither a necessary nor a sufficient justification for the death penalty.[10] Moreover, a recent poll indicates that support for the death penalty drops significantly when life without the possibility of parole is presented as an *79 alternative option.[11] And the available sociological evidence suggests that juries are less likely to impose the death penalty when life without parole is available as a sentence.[12]
The legitimacy of deterrence as an acceptable justification for the death penalty is also questionable, at best. Despite 30 years of empirical research in the area, there remains no reliable statistical evidence that capital punishment in fact deters potential offenders.[13] In the absence of such evidence, deterrence cannot serve as a sufficient penological justification for this uniquely severe and irrevocable punishment.
We are left, then, with retribution as the primary rationale for imposing the death penalty. And indeed, it is the retribution rationale that animates much of the remaining enthu *80 siasm for the death penalty.[14] As Lord Justice Denning argued in 1950, “ ‘some crimes are so outrageous that society insists on adequate punishment, because the wrong-doer deserves it, irrespective of whether it is a deterrent or not.’” See Gregg, 428 U. S., at 184, n. 30. Our Eighth Amendment jurisprudence has narrowed the class of offenders eligible for the death penalty to include only those who have committed outrageous crimes defined by specific aggravating factors. It is the cruel treatment of victims that provides the most persuasive arguments for prosecutors seeking the death penalty. A natural response to such heinous crimes is a thirst for vengeance.[15]
At the same time, however, as the thoughtful opinions by The Chief Justice and Justice Ginsburg make pellucidly clear, our society has moved away from public and painful retribution toward ever more humane forms of punishment. State-sanctioned killing is therefore becoming more and more anachronistic. In an attempt to bring executions in line with our evolving standards of decency, we have adopted increasingly less painful methods of execution, and then declared previous methods barbaric and archaic. But by requiring that an execution be relatively painless, we necessarily protect the inmate from enduring any punishment that is *81 comparable to the suffering inflicted on his victim.[16] This trend, while appropriate and required by the Eighth Amendment’s prohibition on cruel and’unusual punishment, actually undermines the very premise on which public approval of the retribution rationale is based. See, e. g., Kaufman-Osborn, Regulating Death: Capital Punishment and the Late Liberal State, 111 Yale L. J. 681, 704 (2001) (explaining that there is “a tension between our desire to realize the claims of retribution by killing those who kill, and ... a method [of execution] that, because it seems to do no harm other than killing, cannot satisfy the intuitive sense of equivalence that informs this conception of justice”); A. Sarat, When the State Kills: Capital Punishment and the American Condition 60-84 (2001).
Full recognition of the diminishing force of the principal rationales for retaining the death penalty should lead this Court and legislatures to reexamine the question recently posed by Professor Salinas, a former Texas prosecutor and judge: “Is it time to Kill the Death Penalty?” See Salinas, 34 Am. J. Crim. L. 39 (2006). The time for a dispassionate, impartial comparison of the enormous costs that death penalty litigation imposes on society with the benefits that it produces has surely arrived.[17]
*82 III
“[A] penalty may be cruel and unusual because it is excessive and serves no valid legislative purpose.” Furman v. Georgia, 408 U. S. 238, 331 (1972) (Marshall, J., concurring); see also id., at 332 (“The entire thrust of the Eighth Amendment is, in short, against ‘that which is excessive’ ”). Our cases holding that certain sanctions are “excessive,” and therefore prohibited by the Eighth Amendment, have relied *83 heavily on “objective criteria,” such as legislative enactments. See, e. g., Solem v. Helm, 463 U. S. 277, 292 (1983); Harmelin v. Michigan, 501 U. S. 957 (1991); United States v. Bajakajian, 524 U. S. 321 (1998). In our recent decision in Atkins v. Virginia, 536 U. S. 304 (2002), holding that death is an excessive sanction for a mentally retarded defendant, we also relied heavily on opinions written by Justice White holding that the death penalty is an excessive punishment for the crime of raping a 16-year-old woman, Coker v. Georgia, 433 U. S. 584 (1977), and for a murderer who did not intend to kill, Enmund v. Florida, 458 U. S. 782 (1982). In those opinions we acknowledged that “objective evidence, though of great importance, did not 'wholly determine’ the controversy, 'for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.’ ” Atkins, 536 U. S., at 312 (quoting Coker, 433 U. S., at 597 (plurality opinion)).
Justice White was exercising his own judgment in 1972 when he provided the decisive vote in Furman, the case that led to a nationwide reexamination of the death penalty. His conclusion that death amounted to “cruel and unusual punishment in the constitutional sense” as well as the “dictionary sense,” rested on both an uncontroversial legal premise and on a factual premise that he admittedly could not “prove” on the basis of objective criteria. 408 U. S., at 312, 313 (concurring opinion). As a matter of law, he correctly stated that the “needless extinction of life with only marginal contributions to any discernible social or public purposes . . . would be patently excessive” and violative of the Eighth Amendment. Id., at 312. As a matter of fact, he stated, “like my Brethren, I must arrive at judgment; and I can do no more than state a conclusion based on 10 years of almost daily exposure to the facts and circumstances of hundreds and hundreds of federal and state criminal cases involving crimes for which death is the authorized penalty.” *84 Id., at 313. I agree with Justice White that there are occasions when a Member of this Court has a duty to make judgments on the basis of data that falls short of absolute proof.
Our decisions in 1976 upholding the constitutionality of the death penalty relied heavily on our belief that adequate procedures were in place that would avoid the danger of discriminatory application identified by Justice Douglas’ opinion in Furman, id., at 240-257 (concurring opinion), of arbitrary application identified by Justice Stewart, id., at 306 (same), and of excessiveness identified by Justices Brennan and Marshall. In subsequent years a number of our decisions relied on the premise that “death is different” from every other form of punishment to justify rules minimizing the risk of error in capital cases. See, e. g., Gardner v. Florida, 430 U. S. 349,357-358 (1977) (plurality opinion). Ironically, however, more recent cases have endorsed procedures that provide less protections to capital defendants than to ordinary offenders.
Of special concern to me are rules that deprive the defendant of a trial by jurors representing a fair cross section of the community. Litigation involving both challenges for cause and peremptory challenges has persuaded me that the process of obtaining a “death qualified jury” is really a procedure that has the purpose and effect of obtaining a jury that is biased in favor of conviction. The prosecutorial concern that death verdicts would rarely be returned by 12 randomly selected jurors should be viewed as objective evidence supporting the conclusion that the penalty is excessive.[18]
Another serious concern is that the risk of error in capital cases may be greater than in other cases because the facts are often so disturbing that the interest in making sure the *85 crime does not go unpunished may overcome residual doubt concerning the identity of the offender. Our former emphasis on the importance of ensuring that decisions in death cases be adequately supported by reason rather than emotion, Gardner, 430 U. S. 349, has been undercut by more recent decisions placing a thumb on the prosecutor’s side of the scales. Thus, in Kansas v. Marsh, 548 U. S. 163 (2006), the Court upheld a state statute that requires imposition of the death penalty when the jury finds that the aggravating and mitigating factors are in equipoise. And in Payne v. Tennessee, 501 U. S. 808 (1991), the Court overruled earlier cases and held that “victim impact” evidence relating to the personal characteristics of the victim and the emotional impact of the crime on the victim’s family is admissible despite the fact that it sheds no light on the question of guilt or innocence or on the moral culpability of the defendant, and thus serves no purpose other than to encourage jurors to make life or death decisions on the basis of emotion rather than reason.
A third significant concern is the risk of discriminatory application of the death penalty. While that risk has been dramatically reduced, the Court has allowed it to continue to play an unacceptable role in capital cases. Thus, in Mc-Cleskey v. Kemp, 481 U. S. 279 (1987), the Court upheld a death sentence despite the “strong probability that [the defendant’s] sentencing jury... was influenced by the fact that [he was] black and his victim was white.” Id., at 366 (Stevens, J., dissenting); see also Evans v. State, 396 Md. 256, 323, 914 A. 2d 25, 64 (2006), cert. denied, 552 U. S. 835 (2007) (affirming a death sentence despite the existence of a study showing that “the death penalty is statistically more likely to be pursued against a black person who murders a white victim than against a defendant in any other racial combination”).
Finally, given the real risk of error in this class of cases, the irrevocable nature of the consequences is of decisive im *86 portance to me. Whether or not any innocent defendants have actually been executed, abundant evidence accumulated in recent years has resulted in the exoneration of an unacceptable number of defendants found guilty of capital offenses. See Garrett, Judging Innocence, 108 Colum. L. Rev. 55 (2008); Risinger, Innocents Convicted: An Empirically Justified Factual Wrongful Conviction Rate, 97 J. Crim. L. & C. 761 (2007). The risk of executing innocent defendants can be entirely eliminated by treating any penalty more severe than life imprisonment without the possibility of parole as constitutionally excessive.
In sum, just as Justice White ultimately based his conclusion in Furman on his extensive exposure to countless cases for which death is the authorized penalty, I have relied on my own experience in reaching the conclusion that the imposition of the death penalty represents “the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State [is] patently excessive and cruel and unusual punishment violative of the Eighth Amendment.” Furman, 408 U. S., at 812 (White, J., concurring).[19]
*87 IV
The conclusion that I have reached with regard to the constitutionality of the death penalty itself makes my decision in this case particularly difficult. It does not, however, justify a refusal to respect precedents that remain a part of our law. This Court has held that the death penalty is constitutional, and has established a framework for evaluating the constitutionality of particular methods of execution. Under those precedents, whether as interpreted by The Chief Justice or Justice Ginsburg, I am persuaded that the evidence adduced by petitioners fails to prove that Kentucky’s lethal injection protocol violates the Eighth Amendment. Accordingly, I join the Court’s judgment.
Justice Scalia, with whom Justice Thomas joins, concurring in the judgment.
I join the opinion of Justice Thomas concurring in the judgment. I write separately to provide what I think is needed response to Justice Stevens’ separate opinion.
I
Justice Stevens concludes as follows: “[T]he imposition of the death penalty represents the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State [is] patently excessive and cruel and unusual punishment violative of the Eighth Amendment.” Ante, at 86 (opinion concurring in judgment) (internal quotation marks omitted; second bracket in original).
This conclusion is insupportable as an interpretation of the Constitution, which generally leaves it to democratically elected legislatures rather than courts to decide what makes significant contribution to social or public purposes. Besides that more general proposition, the very text of the document recognizes that the death penalty is a permissible legislative choice. The Fifth Amendment expressly requires a *88 presentment or indictment of a grand jury to hold a person to answer for “a capital, or otherwise infamous crime,” and prohibits deprivation of “life” without due process of law. U. S. Const., Amdt. 5. The same Congress that proposed the Eighth Amendment also enacted the Act of April 30, 1790, which made several offenses punishable by death. 1 Stat. 112; see also Gregg v. Georgia, 428 U. S. 153, 176-178 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). Writing in 1977, Professor Hugo Bedau — no friend of the death penalty himself — observed that “[ujntil fifteen years ago, save for a few mavericks, no one gave any credence to the possibility of ending the death penalty by judicial interpretation of constitutional law.” The Courts, the Constitution, and Capital Punishment 118 (1977). There is simply no legal authority for the proposition that the imposition of death as a criminal penalty is unconstitutional other than the opinions in Furman v. Georgia, 408 U. S. 238 (1972) (per curiam), which established a nationwide moratorium on capital punishment that Justice Stevens had a hand in ending four years later in Gregg.
II
What prompts Justice Stevens to repudiate his prior view and to adopt the astounding position that a criminal sanction expressly mentioned in the Constitution violates the Constitution? His analysis begins with what he believes to be the “uncontroversial legal premise” that the “ 'extinction of life with only marginal contributions to any discernible social or public purposes ... would be patently excessive’ and violative of the Eighth Amendment.” Ante, at 83 (quoting in part Furman, supra, at 312 (White, J., concurring)); see also ante, at 78 (citing Gregg, supra, at 183, and n. 28). Even if that were uncontroversial in the abstract (and it is certainly not what occurs to me as the meaning of “cruel and unusual punishments”), it is assuredly controversial (indeed, flatout wrong) as applied to a mode of punishment that is explicitly sanctioned by the Constitution. As to that, the *89 people have determined whether there is adequate contribution to social or public purposes, and it is no business of unelected judges to set that judgment aside. But even if we grant Justice Stevens his “uncontroversial premise,” his application of that premise to the current practice of capital punishment does riot meet the “heavy burden [that] rests on those who would attack the judgment of the representatives of the people.” Gregg, supra, at 175 (joint opinion of Stewart, Powell, and Stevens, JJ.). That is to say, Justice Stevens’ policy analysis of the constitutionality of capital punishment fails on its own terms.
According to Justice Stevens, the death penalty promotes none of the purposes of criminal punishment because it neither prevents more crimes than alternative measures nor serves a retributive purpose. Ante, at 78. He argues that “the recent rise in statutes providing for life imprisonment without the possibility of parole” means that States have a ready alternative to the death penalty. Ibid. Moreover, “[d]espite 30 years of empirical research in the area, there remains no reliable statistical evidence that capital punishment in fact deters potential offenders.” Ante, at 79. Taking the points together, Justice Stevens concludes that the availability of alternatives, and what he describes as the unavailability of “reliable statistical evidence,” renders capital punishment unconstitutional. In his view, the benefits of capital punishment — as compared to other forms of punishment such as life imprisonment — are outweighed by the costs.
These conclusions are not supported by the available data. Justice Stevens’ analysis barely acknowledges the “significant body of recent evidence that capital punishment may well have a deterrent effect, possibly a quite powerful one.” Sunstein & Vermeule, Is Capital Punishment Morally Required? Acts, Omissions, and Life-Life Tradeoffs, 58 Stan. L. Rev. 703, 706 (2005); see also id., at 706, n. 9 (listing the approximately half a dozen studies supporting this conclu *90 sion). According to a “leading national study,” “each execution prevents some eighteen murders, on average.” Id., at 706. “If the current evidence is even roughly correct . . . then a refusal to impose capital punishment will effectively condemn numerous innocent people to death.” Ibid.
Of course, it may well be that the empirical studies establishing that the death penalty has a powerful deterrent effect are incorrect, and some scholars have disputed its deterrent value. See ante, at 79, n. 13. But that is not the point. It is simply not our place to choose one set of responsible empirical studies over another in interpreting the Constitution. Nor is it our place to demand that state legislatures support their criminal sanctions with foolproof empirical studies, rather than commonsense predictions about human behavior. “The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts.” Gregg, supra, at 186 (joint opinion of Stewart, Powell, and Stevens, JJ.). Were Justice Stevens’ current view the constitutional test, even his own preferred criminal sanction — life imprisonment without the possibility of parole— may fail constitutional scrutiny, because it is entirely unclear that enough empirical evidence supports that sanction as compared to alternatives such as life with the possibility of parole.
But even if Justice Stevens’ assertion about the deterrent value of the death penalty were correct, the death penalty would yet be constitutional (as he concedes) if it served the appropriate purpose of retribution. I would think it difficult indeed to prove that a criminal sanction fails to serve a retributive purpose — a judgment that strikes me as inherently subjective and insusceptible of judicial review. Justice Stevens, however, concludes that, because the Eighth Amendment “protect[s] the inmate from enduring any pun *91 ishment that is comparable to the suffering inflicted on his victim,” capital punishment serves no retributive purpose at all. Ante, at 80-81. The infliction of any pain, according to Justice Stevens, violates the Eighth Amendment’s prohibition against cruel and unusual punishments, but so too does the imposition of capital punishment without pain because a criminal penalty lacks a retributive purpose unless it inflicts pain commensurate with the pain that the criminal has caused. In other words, if a punishment is not retributive enough, it is not retributive at all. To state this proposition is to refute it, as Justice Stevens once understood. “[T]he decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community’s belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.” Gregg, 428 U. S., at 184 (joint opinion of Stewart, Powell, and Stevens, JJ.).
Justice Stevens’ final refuge in his cost-benefit analysis is a familiar one: There is a risk that an innocent person might be convicted and sentenced to death — though not a risk that Justice Stevens can quantify, because he lacks a single example of a person executed for a crime he did not commit in the current American system. See ante, at 84-86. His analysis of this risk is thus a series of sweeping condemnations that, if taken seriously, would prevent any punishment under any criminal justice system. According to him, “[t]he prosecutorial concern that death verdicts would rarely be returned by 12 randomly selected jurors should be viewed as objective evidence supporting the conclusion that the penalty is excessive.” Ante, at 84. But prosecutors undoubtedly have a similar concern that any unanimous conviction would rarely be returned by 12 randomly selected jurors. That is why they, like defense counsel, are permitted to use the challenges for cause and peremptory challenges that Justice Stevens finds so troubling, in order to arrive at a jury that both sides believe will be more likely to do justice in a *92 particular case. Justice Stevens’ concern that prosecutors will be inclined to challenge jurors who will not find a person guilty supports not his conclusion, but the separate (and equally erroneous) conclusion that peremptory challenges and challenges for cause are unconstitutional. According to Justice Stevens, “the risk of error in capital cases may be greater than in other cases because the facts are often so disturbing that the interest in making sure the crime does not go unpunished may overcome residual doubt concerning the identity of the offender.” Ante, at 84-85. That rationale, however, supports not Justice Stevens’ conclusion that the death penalty is unconstitutional, but the more sweeping proposition that any conviction in a case in which facts are disturbing is suspect — including, of course, convictions resulting in life without parole in those States that do not have capital punishment. The same is true of Justice Stevens’ claim that there is a risk of “discriminatory application of the death penalty.” Ante, at 85. The same could be said of any criminal penalty, including life without parole; there is no proof that in this regard the death penalty is distinctive.
But of all Justice Stevens’ criticisms of the death penalty, the hardest to take is his bemoaning of “the enormous costs that death penalty litigation imposes on society,” including the “burden on the courts and the lack of finality for victim’s families.” Ante, at 81, and n. 17. Those costs, those burdens, and that lack of finality are in large measure the creation of Justice Stevens and other Justices opposed to the death penalty, who have “encumber[ed] [it] . . . with unwarranted restrictions neither contained in the text of the Constitution nor reflected in two centuries of practice under it” — the product of their policy views “not shared by the vast majority of the American people.” Kansas v. Marsh, 548 U. S. 163, 186 (2006) (Scalia, J., concurring).
*93 III
But actually none of this really matters. As Justice Stevens explains, “ ‘objective evidence, though of great importance, [does] not wholly determine the controversy, for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.’ ” Ante, at 83 (quoting Atkins v. Virginia, 536 U. S. 304, 312 (2002); emphasis added; some internal quotation marks omitted). “I have relied on my own experience in reaching the conclusion that the imposition of the death penalty” is unconstitutional. Ante, at 86 (emphasis added).
Purer expression cannot be found of the principle of rule by judicial flat. In the face of Justice Stevens’ experience, the experience of all others is, it appears, of little consequence. The experience of the state legislatures and the Congress — who retain the death penalty as a form of punishment — is dismissed as “the product of habit and inattention rather than an acceptable deliberative process.” Ante, at 78. The experience of social scientists whose studies indicate that the death penalty deters crime is relegated to a footnote. Ante, at 79, n. 13. The experience of fellow citizens who support the death penalty is described, with only the most thinly veiled condemnation, as stemming from a “thirst for vengeance.” Ante, at 80. It is Justice Stevens’ experience that reigns over all.
I take no position on the desirability of the death penalty, except to say that its value is eminently debatable and the subject of deeply, indeed passionately, held views — which means, to me, that it is preeminently not a matter to be resolved here. And especially not when it is explicitly permitted by the Constitution.
*94 Justice Thomas, with whom Justice Scalia joins, concurring in the judgment.
Although I agree that petitioners have failed to establish that Kentucky’s lethal injection protocol violates the Eighth Amendment, I write separately because I cannot subscribe to the plurality opinion’s formulation of the governing standard. As I understand it, that opinion would hold that a method of execution violates the Eighth Amendment if it poses a substantial risk of severe pain that could be significantly reduced by adopting readily available alternative procedures. Ante, at 52. This standard — along with petitioners’ proposed “unnecessary risk” standard and the dissent’s “untoward risk” standard, post, at 114 (opinion of Ginsburg, J.) — finds no support in the original understanding of the Cruel and Unusual Punishments Clause or in our previous method-of-execution cases; casts constitutional doubt on long-accepted methods of execution; and injects the Court into matters it has no institutional capacity to resolve. Because, in my view, a method of execution violates the Eighth Amendment only if it is deliberately designed to inflict pain, I concur only in the judgment.
I
The Eighth Amendment’s prohibition on the “inflict[ion]” of “cruel and unusual punishments” must be understood in light of the historical practices that led the Framers to include it in the Bill of Rights. Justice Stevens’ ruminations notwithstanding, see ante, at 78-86 (opinion concurring in judgment), it is clear that the Eighth Amendment does not prohibit the death penalty. That is evident both from the ubiquity of the death penalty in the founding era, see S. Banner, The Death Penalty: An American History 23 (2002) (hereinafter Banner) (noting that, in the late 18th century, the death penalty was “the standard penalty for all serious crimes”), and from the Constitution’s express provision for capital punishment, see, e. g., Arndt. 5 (requiring an indict *95 ment or presentment of a grand jury to hold a person for “a capital, or otherwise infamous crime,” and prohibiting deprivation of “life” without due process of law).
That the Constitution permits capital punishment in principle does not, of course, mean that all methods of execution are constitutional. In English and early colonial practice, the death penalty was not a uniform punishment, but rather a range of punishments, some of which the Framers likely regarded as cruel and unusual. Death by hanging was the most common mode of execution both before and after 1791, and there is no doubt that it remained a permissible punishment after enactment of the Eighth Amendment. “An ordinary death by hanging was not, however, the harshest penalty at the disposal of the seventeenth- and eighteenth-century" state.” Banner 70. In addition to hanging, which was intended to, and often did, result in a quick and painless death, “[ojfficials also wielded a set of tools capable of intensifying a death sentence,” that is, “ways of producing a punishment worse than death.” Id., at 54.
One such “tool” was burning at the stake. Because burning, unlike hanging, was always painful and destroyed the body, it was considered “a form of super-capital punishment, worse than death itself.” Id., at 71. Reserved for offenders whose crimes were thought to pose an especially grave threat to the social order — such as slaves who killed their masters and women who killed their husbands — burning a person alive was so dreadful a punishment that sheriffs sometimes hanged the offender first “as an act of charity.” Id., at 72.
Other methods of intensifying a death sentence included “gibbeting,” or hanging the condemned in an iron cage so that his body would decompose in public view, see id., at 72-74, and “public dissection,” a punishment Blackstone associated with murder, 4 W. Blackstone, Commentaries 376 (W. Lewis ed. 1897) (hereinafter Blackstone). But none of these was the worst fate a criminal could meet. That was *96 reserved for the most dangerous and reprobate offenders— traitors. “The punishment of high treason,” Blackstone wrote, was “very solemn and terrible,” id., at 92, and involved “embowelling alive, beheading, and quartering,” id., at 376. Thus, the following death sentence could be pronounced on seven men convicted of high treason in England:
“ ‘That you and each of you, be taken to the place from whence you came, and from thence be drawn on a hurdle to the place of execution, where you shall be hanged by the necks, not till you are dead; that you be severally taken down, while yet alive, and your bowels be taken out and burnt before your faces — that your heads be then cut off, and your bodies cut in four quarters, to be at the King’s disposal. And God Almighty have mercy on your souls.’” G. Scott, History of Capital Punishment 179 (1950).*
The principal object of these aggravated forms of capital punishment was to terrorize the criminal, and thereby more effectively deter the crime. Their defining characteristic was that they were purposely designed to inflict pain and suffering beyond that necessary to cause death. As Blackstone put it, “in very atrocious crimes, other circumstances of terror, pain, or disgrace [were] superadded.” 4 Blackstone 376. These “superadded” circumstances “were care *97 fully handed out to apply terror where it was thought to be most needed,” and were designed “to ensure that death would be slow and painful, and thus all the more frightening to contemplate.” Banner 70.
Although the Eighth Amendment was not the subject of extensive discussion during the debates on the Bill of Rights, there is good reason to believe that the Framers viewed such enhancements to the death penalty as falling within the prohibition of the Cruel and Unusual Punishments Clause. By the late 18th century, the more violent modes of execution had “dwindled away,” id., at 76, and would for that reason have been “unusual” in the sense that they were no longer “regularly or customarily employed,” Harmelin v. Michigan, 501 U. S. 957, 976 (1991) (opinion of Scalia, J.); see also Weems v. United States, 217 U. S. 349, 395 (1910) (White, J., dissenting) (noting that, “prior to the formation of the Constitution, the necessity for the protection afforded by the cruel and unusual punishment guarantee of the English bill of rights had ceased to be a matter of concern, because as a rule the cruel bodily punishments of former times were no longer imposed”). Embellishments upon the death penalty designed to inflict pain for pain’s sake also would have fallen comfortably within the ordinary meaning of the word “cruel.” See 1 S. Johnson, A Dictionary of the English Language 459 (1773) (defining “cruel” to mean “[p]leased with hurting others; inhuman; hard-hearted; void of pity; wanting compassion; savage; barbarous; unrelenting”); 1 N. Webster, An American Dictionary of the English Language 52 (1828) (defining “cruel” as “[disposed to give pain to others, in body or mind; willing or pleased to torment, vex or afflict; inhuman; destitute of pity, compassion or kindness”).
Moreover, the evidence we do have from the debates on the Constitution confirms that the Eighth Amendment was intended to disable Congress from imposing torturous punishments. It was the absence of such a restriction on Congress’ power in the Constitution as drafted in Philadelphia *98 in 1787 that led one delegate at the Massachusetts ratifying convention to complain that Congress was “nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes; and there is no constitutional check on them, but that racks and gibbets may be amongst the most mild instruments of their discipline.” 2 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 111 (2d ed. 1891). Similarly, during the ratification debate in Virginia, Patrick Henry objected to the lack of a Bill of Rights, in part because there was nothing to prevent Congress from inflicting “tortures, or cruel and barbarous punishment[s].” 3 id., at 447-448.
Early commentators on the Constitution likewise interpreted the Cruel and Unusual Punishments Clause as referring to torturous punishments. One commentator viewed the Eighth Amendment as prohibiting “horrid modes of torture”:
“The prohibition of cruel and unusual punishments, marks the improved spirit of the age, which would not tolerate the use of the rack or the stake, or any of those horrid modes of torture, devised by human ingenuity for the gratification of fiendish passion.” J. Bayard, A Brief Exposition of the Constitution of the United States 154 (2d ed. 1840).
Similarly, another commentator found “sufficient reasons” for the Eighth Amendment in the “barbarous and cruel punishments” inflicted in less enlightened countries:
“Under the [Eighth] amendment the infliction of cruel and unusual punishments, is also prohibited. The various barbarous and cruel punishments inflicted under the laws of some other countries, and which profess not to be behind the most enlightened nations on earth in civilization and refinement, furnish sufficient reasons for this express prohibition. Breaking on the wheel, flay *99 ing alive, rending asunder with horses, various species of horrible tortures inflicted in the inquisition, maiming, mutilating and scourging' to death, are wholly alien to the spirit of our humane general constitution.” B. Oliver, The Rights of An American Citizen 186 (1882) (reprint 1970).
So barbaric were the punishments prohibited by the Eighth Amendment that Joseph Story thought the provision “wholly unnecessary in a free government, since it is scarcely possible, that any department of such a government should authorize, or justify such atrocious conduct.” 3 J. Story, Commentaries on the Constitution of the United States 750 (1833).
II
Consistent with the original understanding of the Cruel and Unusual Punishments Clause, this Court’s cases have repeatedly taken the view that the Framers intended to prohibit torturous modes of punishment akin to those that formed the historical backdrop of the Eighth Amendment. See, e. g., Estelle v. Gamble, 429 U. S. 97, 102 (1976) (“[T]he primary concern of the drafters was to proscribe ‘torturéis]’ and other ‘barbartous]’ methods of punishment”); Weems, supra, at 390 (White, J., dissenting) (“[I]t may not be doubted, and indeed is not questioned by any one, that the cruel punishments against which the bill of rights provided were the atrocious, sanguinary and inhuman punishments which had been inflicted in the past upon the persons of criminals”). That view has permeated our method-of-execution cases. Thrice the Court has considered a challenge to a modern method of execution, and thrice it has rejected the challenge, each time emphasizing that the Eighth Amendment is aimed at methods of execution purposely designed to inflict pain.
In the first ease, Wilkerson v. Utah, 99 U. S. 130 (1879), the Court rejected the contention that death by firing squad was cruel and unusual. In so doing, it reviewed the various *100 modes of execution catalogued by Blackstone, repeating his observation that “in very atrocious crimes other circumstances of terror, pain, or disgrace were sometimes super-added.” Id., at 135. The Court found it “safe to affirm that punishments of torture, such as those mentioned by [Blackstone], and all others in the same line of unnecessary cruelty, are forbidden by [the Eighth Amendment].” Id., at 136. The unanimous Court had no difficulty concluding that death by firing squad did not “fal[l] within that category.” Ibid.
Similarly, when the Court in In re Kemmler, 136 U. S. 436, 446 (1890), unanimously rejected a challenge to electrocution, it interpreted the Eighth Amendment to prohibit punishments that “were manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like”:
“Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life.” Id., at 447.
Finally, in Louisiana ex rel. Francis v. Resweber, 329 U. S. 459 (1947), the Court rejected the petitioner’s contention that the Eighth Amendment prohibited Louisiana from subjecting him to a second attempt at electrocution, the first attempt having failed when “[t]he executioner threw the switch but, presumably because of some mechanical difficulty, death did not result.” Id., at 460 (plurality opinion). Characterizing the abortive attempt as “an accident, with no suggestion of malevolence,” id., at 463, the plurality opinion concluded that “the fact that petitioner ha[d] already been subjected to a current of electricity [did] not make his subsequent execution any more cruel in the constitutional sense than any other execution”:
“The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of pun *101 ishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution.” Id., at 464.
Ill
In light of this consistent understanding of the Cruel and Unusual Punishments Clause as forbidding purposely torturous punishments, it is not surprising that even an ardent abolitionist was constrained to acknowledge in 1977 that “[a]n unbroken line of interpreters has held that it was the original understanding and intent of the framers of the Eighth Amendment ... to proscribe as ‘cruel and unusual’ only such modes of execution as compound the simple infliction of death with added cruelties or indignities.” H. Bedau, The Courts, the Constitution, and Capital Punishment 35. What is surprising is the plurality’s willingness to discard this unbroken line of authority in favor of a standard that finds no support in the original understanding of the Eighth Amendment or in our method-of-execution cases and that, disclaimers notwithstanding, “threaten[s] to transform courts into boards of inquiry charged with determining ‘best practices’ for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology.” Ante, at 51.
We have never suggested that a method of execution is “cruel and unusual” within the meaning of the Eighth Amendment simply because it involves a risk of pain— whether “substantial,” “unnecessary,” or “untoward” — that could be reduced by adopting alternative procedures. And for good reason. It strains credulity to suggest that the defining characteristic of burning at the stake, disemboweling, drawing and quartering, beheading, and the like was that *102 they involved risks of pain that could be eliminated by using alternative methods of execution. Quite plainly, what defined these punishments was that they were designed to inflict torture as a way of enhancing a death sentence; they were intended to produce a penalty worse than death, to accomplish something “more than the mere extinguishment of life.” Kemmler, supra, at 447. The evil the Eighth Amendment targets is intentional infliction of gratuitous pain, and that is the standard our method-of-execution cases have explicitly or implicitly invoked.
Thus, the Court did not find it necessary in Wilkerson to conduct a comparative analysis of death by firing squad as opposed to hanging or some other method of execution. Nor did the Court inquire into the precise procedures used to execute an individual by firing squad in order to determine whether they involved risks of pain that could be alleviated by adopting different procedures. It was enough that death by firing squad was well established in military practice, 99 U. S., at 134-135, and plainly did not fall within the “same line of unnecessary cruelty” as the punishments described by Blackstone, id., at 136.
The same was true in Kemmler. One searches the opinion in vain for a comparative analysis of electrocution versus other methods of execution. The Court observed that the New York Legislature had adopted electrocution in order to replace hanging with “‘the most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases.’ ” 136 U. S., at 444. But there is no suggestion that the Court thought it necessary to sift through the “voluminous mass of evidence . . . taken [in the courts below] as to the effect of electricity as an agent of death,” id., at 442, in order to confirm that electrocution in fact involved less substantial risks of pain or lingering death than hanging. The court below had rejected the challenge because the “act was passed in the effort to devise a more *103 humane method of reaching the result,” and “courts were bound to presume that the legislature was possessed of the facts upon which it took action.” Id., at 447. Treating the lower court’s decision “as involving an adjudication that the statute was not repugnant to the Federal Constitution,” ibid., the Court found that conclusion “so plainly right,” ibid., that it had “no hesitation” in denying the writ of error, id., at 449.
Likewise in Resweber, the Court was confronted in dramatic fashion with the reality that the electric chair involved risks of error or malfunction that could result in excruciating pain. See 329 U. S., at 480, n. 2 (Burton, J., dissenting) (quoting affidavits from the petitioner’s brief recounting that during the unsuccessful first attempt at electrocution, the petitioner’s “‘lips puffed out and his body squirmed and tensed and he jumped so that the chair rocked on the floor’ ”). But absent “malevolence” or a “purpose to inflict unnecessary pain,” the Court concluded that the Constitution did not prohibit Louisiana from subjecting the petitioner to those very risks a second time in order to carry out his death sentence. Id., at 463, 464 (plurality opinion); id., at 471 (Frankfurter, J., concurring); see also Furman v. Georgia, 408 U. S. 238, 326-327 (1972) (Marshall, J., concurring) (describing Resweber as holding “that the legislature adopted electrocution for a humane purpose, and that its will should not be thwarted because, in its desire to reduce pain and suffering in most cases, it may have inadvertently increased suffering in one particular case”). No one suggested that Louisiana was required to implement additional safeguards or alternative procedures in order to reduce the risk of a second malfunction. And it was the dissenters in Resweber who insisted that the absence of an intent to inflict pain was irrelevant. 329 U. S., at 477 (Burton, J., dissenting) (“The intent of the executioner cannot lessen the torture or excuse the result”).
*104 IV
Aside from lacking support in history or precedent, the various risk-based standards proposed in this case suffer from other flaws, not the least of which is that they cast substantial doubt on every method of execution other than lethal injection. It may well be that other methods of execution such as hanging, the firing squad, electrocution, and lethal gas involve risks of pain that could be eliminated by switching to lethal injection. Indeed, they have been attacked as unconstitutional for that very reason. See, e. g., Gomez v. United States Dist. Court for Northern Dist. of Cal., 503 U. S. 653, 654,656-657 (1992) (Stevens, J., dissenting) (arguing that lethal gas violates the Eighth Amendment because of “the availability of more humane and less violent methods of execution,” namely, lethal injection); Glass v. Louisiana, 471 U. S. 1080, 1093 (1985) (Brennan, J., dissenting from denial of certiorari) (arguing that electrocution violates the Eighth Amendment because it poses risks of pain that could be alleviated by “other currently available means of execution,” such as lethal injection); Campbell v. Wood, 18 F. 3d 662, 715 (CA9 1994) (Reinhardt, J., concurring and dissenting) (arguing that hanging violates the Eighth Amendment because it involves risks of pain and mutilation not presented by lethal injection). But the notion that the Eighth Amendment permits only one mode of execution, or that it requires an anesthetized death, cannot be squared with the history of the Constitution.
It is not a little ironic — and telling — that lethal injection, hailed just a few years ago as the humane alternative in light of which every other method of execution was deemed an unconstitutional relic of the past, is the subject of today’s challenge. It appears the Constitution is “evolving” even faster than I suspected. And it is obvious that, for some who oppose capital punishment on policy grounds, the only acceptable end point of the evolution is for this Court, in an exercise of raw judicial power unsupported by the text or *105 history of the Constitution, or even by a contemporary moral consensus, to strike down the death penalty as cruel and unusual in all circumstances. In the meantime, though, the next best option for those seeking to abolish the death penalty is to embroil the States in never-ending litigation concerning the adequacy of their execution procedures. But far from putting an end to abusive litigation in this area, and thereby vindicating in some small measure the States’ “significant interest in meting out a sentence of death in a timely fashion,” Nelson v. Campbell, 541 U. S. 637, 644 (2004), today’s decision is sure to engender more litigation. At what point does a risk become “substantial”? Which alternative procedures are “feasible” and “readily implemented”? When is a reduction in risk “significant”? What penological justifications are “legitimate”? Such are the questions the lower courts will have to grapple with in the wake of today’s decision. Needless to say, we have left the States with nothing resembling a bright-line rule.
Which brings me to yet a further problem with comparative-risk standards: They require courts to resolve medical and scientific controversies that are largely beyond judicial ken. Little need be said here, other than to refer to the various opinions filed by my colleagues today. Under the competing risk standards advanced by the plurality opinion and the dissent, for example, the difference between a lethal injection procedure that satisfies the Eighth Amendment and one that does not may well come down to one’s judgment with respect to something as hairsplitting as whether an eyelash stroke is necessary to ensure that the inmate is unconscious, or whether instead other measures have already provided sufficient assurance of unconsciousness. Compare post, at 118 (Ginsburg, J., dissenting) (criticizing Kentucky’s protocol because “[n]o one calls the inmate’s name, shakes him, brushes his eyelashes to test for a reflex, or applies a noxious stimulus to gauge his response”), with ante, at 60-61 (rejecting the dissent’s criticisms because *106 “an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the State could take as a failsafe for other, independently adequate measures”). We have neither the authority nor the expertise to micromanage the States’ administration of the death penalty in this manner. There is simply no reason to believe that “unelected” judges without scientific, medical, or penological training are any better suited to resolve the delicate issues surrounding the administration of the death penalty than are state administrative personnel specifically charged with the task. Cf. ante, at 74-75 (Stevens, J., concurring in judgment) (criticizing the States’ use of the three-drug protocol because “[i]n the majority of States that use the three-drug protocol, the drugs were selected by unelected department of correction officials with no specialized medical knowledge and without the benefit of expert assistance or guidance”).
In short, I reject as both unprecedented and unworkable any standard that would require the courts to weigh the relative advantages and disadvantages of different methods of execution or of different procedures for implementing a given method of execution. To the extent that there is any comparative element to the inquiry, it should be limited to whether the challenged method inherently inflicts significantly more pain than traditional modes of execution such as hanging and the firing squad. See, e. g., Gray v. Lucas, 463 U. S. 1237, 1239-1240 (1983) (Burger, C. J., concurring in denial of certiorari) (rejecting an Eighth Amendment challenge to lethal gas because the petitioner had not shown that “ The pain and terror resulting from death by cyanide gas is so different in degree or nature from that resulting from other traditional modes of execution as to implicate the eighth amendment right’ ” (quoting Gray v. Lucas, 710 F. 2d 1048, 1061 (CA5 1983))); Hernandez v. State, 43 Ariz. 424, 441, 32 P. 2d 18, 25 (1934) (“The fact that [lethal gas] is less painful and more humane than hanging is all that is required to refute completely the charge that it constitutes cruel and un *107 usual punishment within the meaning of this expression as used in [the Eighth Amendment]”).
V
Judged under the proper standard, this is an easy case. It is undisputed that Kentucky adopted its lethal injection protocol in an effort to make capital punishment more humane, not to add elements of terror, pain, or disgrace to the death penalty. And it is undisputed that, if administered properly, Kentucky’s lethal injection protocol will result in a swift and painless death. As the Sixth Circuit observed in rejecting a similar challenge to Tennessee’s lethal injection protocol, we “do not have a situation where the State has any intent (or anything approaching intent) to inflict unnecessary pain; the complaint is that the State’s pain-avoidance procedure may fail because the executioners may make a mistake in implementing it.” Workman v. Bredesen, 486 F. 3d 896, 907 (2007). But “[t]he risk of negligence in implementing a death-penalty procedure ... does not establish a cognizable Eighth Amendment claim.” Id., at 907-908. Because Kentucky’s lethal injection protocol is designed to eliminate pain rather than to inflict it, petitioners’ challenge must fail. I accordingly concur in the Court’s judgment affirming the decision below.

The 2000 Report of the American Veterinary Medical Association (AVMA) Panel on Euthanasia stated that a “combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent.” 218 J. Am. Veterinary Med. Assn. 669, 680 (2001). In a 2006 supplemental statement, however, the AVMA clarified that this statement was intended as a recommendation against mixing a barbiturate and neuromuscular blocking agent in the same syringe, since such practice creates the possibility that the paralytic will take effect before the barbiturate, rendering the animal paralyzed while still conscious. The 2007 AVMA Guidelines on Euthanasia plainly state that the application of a barbiturate, paralyzing agent, and potassium chloride delivered in separate sy *72 ringes or stages is not discussed in the report. Several veterinarians, however, have filed an amici brief in this case arguing that the three-drug cocktail fails to measure up to veterinary standards and that the use of pancuronium bromide should be prohibited. See Brief for Dr. Kevin Concannon et al. as Amici Curiae 16-18. The Humane Society has also declared “inhumane” the use of “any combination of sodium pentobarbital with a neuromuscular blocking agent.” R. Rhoades, The Humane Society of the United States, Euthanasia Training Manual 133 (2002); see also Alper, Anesthetizing the Public Conscience: Lethal Injection and Animal Euthanasia, 35 Ford. Urb. L. J. 817, 840 (2008) (concluding, based on a comprehensive study of animal euthanasia laws and regulations, that “the field of animal euthanasia has reached a unanimous consensus that neuromuscular blocking agents like pancuronium have no legitimate place in the execution process”), online at http://papers.ssrn.com/sol3/papers.cfin? abstract_id=l109258 (all Internet materials as visited Apr. 10, 2008, and available in Clerk of Court’s ease file).

 See also, e. g., Fla. Stat. §828.058(3) (2006) (“[A]ny substance which acts as a neuromuscular blocking agent. . . may not be used on a dog or cat for any purpose”); N. J. Stat. Ann. §4:22-19.3 (West 1998) (“Whenever any dog, eat, or any other domestic animal is to be destroyed, the use of succinylcholine chloride, curare, curariform drugs, or any other substance which acts as a neuromuscular blocking agent is prohibited”); N. Y. Agrie. & Mkts. Law Ann. § 374(2-b) (West 2004) (“No person shall euthanize any dog or cat with T-61, curare, any curariform drug, any neuromuscular blocking agent or any other paralyzing drug”); Tenn. Code Ann. §44-17-303(c) (2007) (“Succinylcholine chloride, curare, curariform mixtures ... or any substance that acts as a neuromuscular blocking agent... may not be used on any non-livestock animal for the purpose of euthanasia”). According to a recent study, not a single State sanctions the use of a paralytic agent in the administration of animal euthanasia, 9 States explicitly ban the use of such drugs, 13 others ban it by implication — i. e., by mandating the use of nonparalytic drugs, 12 arguably ban it by reference to the AVMA guidelines, and 8 others express a strong preference for use of nonparalytic drugs. Alper, supra, at 841-842, and App. I to Alper, supra, at 853.

 Indeed, the decision by prison administrators to use the drug on humans for esthetic reasons is not supported by any consensus of medical professionals. To the contrary, the medical community has considered— and rejected — this esthetic rationale for administering neuromuscular blocking agents in end-of-life care for terminally ill patients whose families may be disturbed by involuntary movements that are misperceived as signs of pain or discomfort. As explained in an amici curiae brief submitted by critical care providers and clinical ethicists, the medical and medical ethics communities have rejected this rationale because there is a danger that such drugs will mask signs that the patient is actually in pain. See Brief for Critical Care Providers et al. as Amici Curiae.

 Of the 35 state statutes providing for execution by lethal injection, only approximately one-third specifically approve the use of a chemical paralytic agent. See Ark. Code Ann. §5-4-617 (2006); Idaho Code §19-2716 (Lexis 2004); Ill. Comp. Stat., ch. 725, §5/119-5 (West 2006); Md. Crim. Law Code Ann. §2-303 (Lexis Supp. 2007); Miss. Code Ann. §99-19-51 (2007); Mont. Code Ann. §46-19-103 (2007); N. H. Rev. Stat. Ann. §630:5 (2007); N. M. Stat. Ann. §31-14-11 (2000); N. C. Gen. Stat. Ann. § 15-187 (Lexis 2007); Okla. Stat., Tit. 22, § 1014 (West 2001); Ore. Rev. Stat. §137.473 (2003); Pa. Stat. Ann., Tit. 61, §3004 (Purdon 1999); Wyo. Stat. Ann. § 7-13-904 (2007). Twenty of the remaining States do not specify any particular drugs. See Ariz. Rev. Stat. Ann. § 13-704 (West 2001); Cal. Penal Code Ann. §3604 (West 2000); Conn. Gen. Stat. §54-100 (2007); Del. Code Ann., Tit. 11, §4209 (2006 Supp.); Fla. Stat. §922.105 (2006); Ga. Code Ann. §17-10-38 (2004); Ind. Code §35-38-6-1 (West 2004); Kan. Stat. Ann. §22-4001 (2006 Cum. Supp.); Ky. Rev. Stat. Ann. §431.220 (West 2006); La. Stat. Ann. §15:569 (West 2005); Mo. Rev. Stat. §546.720 (2007 Cum. Supp.); Nev. Rev. Stat. § 176.355 (2007); Ohio Rev. Code Ann. §2949.22 (Lexis 2006); S. C. Code Ann. §24-3-530 (2007); S. D. Codified Laws §23A-27A-32 (Supp. 2007); Tenn. Code Ann. §40-23-114 (2006); Tex. Code Crim. Proc. Ann., Art. 43.14 (Vernon 2006 Supp. Pamphlet); Utah Code Ann. § 77-18-5.5 (Lexis Supp. 2007); Va. Code Ann. § 53.1-234 (Lexis Supp. 2007); Wash. Rev. Code § 10.95.180 (2006).

 Colorado’s statute provides for “a continuous intravenous injection of a lethal quantity of sodium thiopental or other equally or more effective substance sufficient to cause death.” §18-1.3-1202. Despite the fact that the statute specifies only sodium thiopental, it appears that Colorado uses the same three drugs as other States. See Denno, The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty, 76 Ford. L. Rev. 49, 97, and n. 322 (2007).

 Notably, the Oklahoma medical examiner who devised the protocol has disavowed the use of pancuronium bromide. When asked in a recent interview why he included it in his formula, he responded: ‘“It’s a good question. If I were doing it now, I would probably eliminate it.’” E. Cohen, Lethal injection creator: Maybe it’s time to change formula, online at http://www.cnn.com/2007/HEALTH/04/30/lethal.injection/index.html.

 Officials of the DOC had before them an advisory paper submitted by a group of New York doctors recommending sodium thiopental “ ‘without the addition of other drugs,”’ and the supervisor of the health services unit was informed in a memo from a colleague that pancuronium bromide “ ‘will cause paralysis of the vocal chords and stop breathing, and hence could cause death by asphyxiation.’ ” Edwards, 170 N. J. L. J., at 673.

 Further, concerns about this issue may have played a role in New Jersey’s subsequent decisions to create a New Jersey Death Penalty Study Commission in 2006, and ultimately to abolish the death penalty in 2007.

 For similar reasons, States may also be well advised to reconsider the sufficiency of their procedures for checking the inmate’s consciousness. See post, at 118-123 (Ginsburg, J., dissenting).
Justice Auto correctly points out that the Royal Dutch Society for the Advancement of Pharmacy recommends pancuronium bromide “as the second of the two drugs to be used in cases of euthanasia.” Ante, at 69 (concurring opinion). In the Netherlands, however, physicians with training in anesthesiology are involved in assisted suicide. For reasons *78 Justice Alito details, see ante, at 64-66, physicians have no similar role in American executions. When trained medical personnel administer anesthesia and monitor the individual’s anesthetic depth, the serious risks that concern me are not presented.

 Forty-eight States now have some form of life imprisonment without parole, with the majority of statutes enacted within the last two decades. See Note, A Matter of Life and Death: The Effect of Life-Without-Parole Statutes on Capital Punishment, 119 Harv. L. Rev. 1838, 1839, 1841-1844 (2006).

 See R. Dieter, Sentencing for Life: Americans Embrace Alternatives to the Death Penalty (Apr. 1993), online at http://www.deathpenaltyinfo. org/article.php?scid=45&did=481.

 In one study, potential capital jurors in Virginia stated that knowing about the existence of statutes providing for life without the possibility of parole would significantly influence their sentencing decision. In another study, a significant majority of potential capital jurors in Georgia said they would be more likely to select a life sentence over a death sentence if they knew that the defendant would be ineligible for parole for at least 25 years. See Note, 119 Harv. L. Rev., at 1845. Indeed, this insight drove our decision in Simmons v. South Carolina, 512 U. S. 154 (1994), that capital defendants have a due process right to require that their sentencing juries be informed of their ineligibility for parole.

 Admittedly, there has been a recent surge in scholarship asserting the deterrent effect of the death penalty, see, e. g., Mocan & Gittings, Getting Off Death Row: Commuted Sentences and the Deterrent Effect of Capital Punishment, 46 J. Law & Econ. 453 (2003); Adler & Summers, Capital Punishment Works, Wall Street Journal, Nov. 2, 2007, p. A13, but there has been an equal, if not greater, amount of scholarship criticizing the methodologies of those studies and questioning the results, see, e.g., Fagan, Death and Deterrence Redux: Science, Law and Causal Reasoning on Capital Punishment, 4 Ohio St. J. Crim. L. 255 (2006); Donohue & Wolfers, Uses and Abuses of Empirical Evidence in the Death Penalty Debate, 58 Stan. L. Rev. 791 (2005).

 Retribution is the most common basis of support for the death penalty. A recent study found that 37% of death penalty supporters cited “[a]n eye for an eye/they took a life/fits the crime” as their reason for supporting capital punishment. Another 13% cited “They deserve it.” The next most common reasons — “[s]av[ing] taxpayers money/cost associated with prison” and deterrence — were each cited by 11% of supporters. See Dept, of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 147 (2003) (Table 2.55), online at http://www.albany.edu/ sourcebook/pdf/t255.pdf.

 For example, family members of victims of the Oklahoma City bombing called for the Government to “ ‘put [Timothy McVeigh] inside a bomb and blow it up.’” Walsh, One Arraigned, Two Undergo Questioning, Washington Post, Apr. 22, 1995, pp. Al, A13. Commentators at the time noted that an overwhelming percentage of Americans felt that executing McVeigh was not enough. Lindner, A Political Verdict: McVeigh: When Death Is Not Enough, L. A. Times, June 8, 1997, p. Ml.

 For example, one survivor of the Oklahoma City bombing expressed a belief that “ ‘death by [lethal] injection [was] “too good” for McVeigh.’ ” A. Sarat, When the State Kills: Capital Punishment and the American Condition 64 (2001). Similarly, one mother, when told that her child’s killer would die by lethal injection, asked: “Do they feel anything? Do they hurt? Is there any pain? Very humane compared to what they’ve done to our children. The torture they’ve put our kids through. I think sometimes it’s too easy. They ought to feel something. If it’s fire burning all the way through their body or whatever. There ought to be some little sense of pain to it.” Id., at 60 (emphasis deleted).

 For a discussion of the financial costs as well as some of the less tangible costs of the death penalty, see Kozinski & Gallagher, Death: The Ultimate Run-On Sentence, 46 Case W. Res. L. Rev. 1 (1995) (discussing, inter alia, the burden on the courts and the lack of finality for victim’s families). Although a lack of finality in death eases may seem counterintuitive, Kozinski and Gallagher explain:
*82 “Death eases raise many more issues, and more complex issues, than other criminal cases, and they are attacked with more gusto and reviewed with more vigor in the courts. This means there is a strong possibility that the conviction or sentence will be reconsidered — seriously reconsidered— five, ten, twenty years after the trial. . . . One has to wonder and worry about the effect this has on the families of the victims, who have to live with the possibility — and often the reality — of retrials, evidentiary hearings, and last-minute stays of execution for decades after the crime.” Id., at 17-18 (footnotes omitted).
Thus, they conclude that “we are left in limbo, with machinery that is immensely expensive, that chokes our legal institutions so they are impeded from doing all the other things a society expects from its courts, [and] that visits repeated trauma on victims’ families ....” Id., at 27-28; see also Block, A Slow Death, N. Y. Times, Mar. 15,2007, p. A27 (discussing the “enormous costs and burdens to the judicial system” resulting from the death penalty).
Some argue that these costs are the consequence of judicial insistence on unnecessarily elaborate and lengthy appellate procedures. To the contrary, they result “in large part from the States’ failure to apply constitutionally sufficient procedures at the time of initial [conviction or] sentencing.” Knight v. Florida, 528 U. S. 990, 998 (1999) (Breyer, J., dissenting from denial of certiorari). They may also result from a general reluctance by States to put large numbers of defendants to death, even after a sentence of death is imposed. Cf. Tempest, Death Row Often Means a Long Life; California Condemns Many Murderers, but New Are Ever Executed, L. A. Times, Mar. 6, 2005, p. B1 (noting that California death row inmates account for about 20% of the Nation’s total death row population, but that the State accounts for only 1% of the Nation’s executions). In any event, they are most certainly not the fault of judges who do nothing more than ensure compliance with constitutional guarantees prior to imposing the irrevocable punishment of death.

 See Uttecht v. Brown, 551 U. S. 1, 35 (2007) (Stevens, J., dissenting) (explaining that “[mjillions of Americans oppose the death penalty,” and that “[a] cross section of virtually every community in the country includes citizens who firmly believe the death penalty is unjust but who nevertheless are qualified to serve as jurors in capital cases”).

 Not a single Justice in Furman concluded that the mention of deprivation of “life” in the Fifth and Fourteenth Amendments insulated the death penalty from constitutional challenge. The five Justices who concurred in the judgment necessarily rejected this argument, and even the four dissenters, who explicitly acknowledged that the death penalty was not considered impermissibly cruel at the time of the framing, proceeded to evaluate whether anything had changed in the intervening 181 years that nevertheless rendered capital punishment unconstitutional. Furman, 408 U. S., at 380-384 (Burger, C. J., joined by Blackmun, Powell, and Rehnquist, JJ., dissenting); see also id., at 420 (Powell, J., joined by Burger, C. J., and Blackmun and Rehnquist, JJ., dissenting) (“Nor are ‘cruel and unusual punishments’ and ‘due process of law’ static concepts whose meaning and scope were sealed at the time of their writing”). And indeed, the guarantees of procedural fairness contained in the Fifth and Fourteenth Amendments do not resolve the substantive questions relating to the separate limitations imposed by the Eighth Amendment.

As gruesome as these methods of execution were, they were not the worst punishments the Framers would have been acquainted with. After surveying the various “sup eradd [itions] ” to the death penalty in English law, as well as lesser punishments such as “mutilation or dismembering, by cutting off the hand or ears” and stigmatizing the offender “by slitting the nostrils, or branding in the hand or cheek,” Blackstone was able to congratulate his countrymen on their refinement, in contrast to the barbarism on the Continent: “Disgusting as this catalogue may seem, it will afford pleasure to an English reader, and do honor to the English law, to compare it with that shocking apparatus of death and torment to be met with in the criminal codes of almost every other nation in Europe.” 4 Blackstone 377.